UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE HILL,

        Plaintiff,                    Civil Action No. 2:12-cv-14429

     v.                            District Judge Robert H. Cleland
                                   Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

Plaintiff Dwayne Hill worked as a brick mason from 1984 until October 2009. (Dkt. 7, Administrative Transcript ("Tr.") 169.) In 2007, however, Hill began experiencing breathing problems. (Tr. 207.) The condition slowly worsened and by mid-2009, Hill was experiencing shortness of breath and fatigue at work. (Tr. 205, 208.) A pulmonologist soon diagnosed Hill with sarcoidosis, a disease involving "the growth of tiny collections of inflammatory cells" and often affecting the lungs.[1] Because of this condition, and perhaps because of symptoms associated with high blood pressure and cholesterol, Hill applied for social security benefits. An Administrative Law Judge, acting on behalf of Defendant Acting Commissioner of Social Security, denied Hill's application. Hill then appealed here. (*See* Dkt. 1, Compl.) Before the Court for a report and

---

[1] Mayo Clinic Website, *Sarcoidosis*, http://www.mayoclinic.com/health/sarcoidosis/DS00251 (last visited Sept. 23, 2013).

recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 9, 11). For the reasons set forth below, this Court finds that substantial evidence supports the ALJ's decision to discount Hill's credibility, and, therefore, Hill has not demonstrated that the ALJ inaccurately assessed his functional limitations. Defendant's Motion for Summary Judgment (Dkt. 11) should be GRANTED and Plaintiff's Motion for Summary Judgment (Dkt. 9) should be DENIED.

## I. BACKGROUND

### A. Procedural History

Asserting that he had been unable to work since June 15, 2009, Hill filed applications for disability insurance benefits and supplemental security income in April 2010. (Tr. 22.) After both applications were denied, Hill requested a hearing before an administrative law judge. (*Id.*) In June 2011, Hill appeared, with counsel, before Administrative Law Judge Elliot Bunce. (*See* Tr. 33-52.) Upon listening to Hill's testimony and reviewing the administrative record, ALJ Bunce concluded that Hill was not disabled within the meaning of the Social Security Act. (*See* Tr. 22-29.) His decision became the final decision of Defendant Acting Commissioner of Social Security in August 2010, when the Social Security Administration's Appeals Council denied Hill's request for further administrative review. (Tr. 1.) This lawsuit followed. (Dkt. 1, Compl.)

### B. Medical Evidence

On June 3, 2009, Hill went to see Dr. Koteswara Rao Vemuri for the first time. (Tr. 228.) Hill reported experiencing shortness of breath while working. (Tr. 228.) On exam, Hill's heart rate and rhythm were normal and his air entry was "good" without "wheezes or crackles." (Tr. 228.) Dr. Vemuri assessed "[p]ossible reactive airway disease." (*Id.*) He provided Hill with a prescription for Advair and ProAir inhalers. (*Id.*)

About three weeks later, at Dr. Vemuri's request, Hill underwent an exercise stress test with Dr. Wilfredo Rivera, a cardiologist. (Tr. 244-45.) Dr. Rivera's impressions included, "[m]oderate to severe functional limitation for age," "[h]ypertensive blood pressure response to limited exercise," "mild pulmonic insufficiency," and "[m]oderately elevated pulmonary artery diastolic pressure." (Tr. 245.)

Hill returned to Dr. Vemuri on July 6, 2009. (Tr. 227, 241.) Because Hill continued to report shortness of breath, Dr. Vemuri ordered a chest x-ray, advised a sleep study in view of "questionable" obstructive sleep apnea, and referred Hill to Dr. Frazer Wadenstorer, a pulmonologist. (*Id.*)

Hill's chest x-ray was "suspicious for mediastinal and hilar adenopathy"; as such, the radiologist recommended a CT scan. (Tr. 241.) That scan revealed "extensive enlarged mediastinal, hilar, subcarinal and prevascular lymphadenopathy [abnormal enlargement of the lymph nodes] along with reticular nodular opacities involving both mid and upper lung fields." (Tr. 240.) In the words of the CT scan radiologist, the results were "worrisome for sarcoidosis." (*Id.*; *see also* Tr. 242.)

On July 23, 2009, Hill had his first appointment with Dr. Wadenstorer, the pulmonologist Dr. Vemuri had mentioned. Hill told Dr. Wadenstorer that his breathing problems had started about two years prior and slowly progressed. (Tr. 207.) Hill explained that in the last six months, his cough had worsened and included wheezing. (*Id.*) Dr. Wadenstorer noted that Hill had worked as a mason for 20 years, a job which involved cutting concrete and the associated dust. (*Id.*) Dr. Wadenstorer performed a "[c]omplete pulmonary function test"; his impression was a "[n]ormal physiologic study" with only mild forced expiratory flow reduction and mild decrease in forced vital capacity.

3

(Tr. 215.) Dr. Wadenstorer also reviewed the stress echocardiogram and the July 2009 CT scan. (Tr. 208.) He concluded that Hill had "bilateral hilar adenopathy with upper lung zone predominance, reticular nodular pattern." (Tr. 208.) "This [was] most likely on the basis of sarcoidosis." (*Id.*) Dr. Wadenstorer ordered the following studies: "bronchoscopy with transbronchial biopsies and probable transbronchial needle aspiratus." (*Id.*)

Hill returned to Dr. Wadenstorer in August 2009. (Tr. 205.) He reported feeling fatigued at work and having a "moderate amount of shortness of breath." (*Id.*) Hill denied having a cough, however. (*Id.*) Upon reviewing the results of the previously recommended sleep study, bronchoscopy, and transbronchial biopsies, Dr. Wadenstorer concluded, "this patient has sarcoidosis with bilateral interstitial lung involvement and significant hilar and mediastinal adenopathy. The patient also has significant underlying obstructive sleep apnea with mild nocturnal oxygen desaturations." (*Id.*) For Hill's sleep apena, Dr. Wadenstorer recommended a CPAP titration study; for Hill's sarcoidosis, he prescribed prednisone, a corticosteroid. (*Id.*) Dr. Wadenstorer noted, "I have told him that he should plan on being on corticosteroids for probably at least the next year, I will see him back monthly for the first three months and then we will decide how he is doing at that time. I explained to [Mr. Hill] that sarcoidosis should have a good prognosis, however, only time will tell." (Tr. 206.)

Also in August 2009, Hill saw his primary-care physician. (Tr. 226.) Hill told Dr. Vemuri that, aside from his sarcoidosis, he was doing well. (*Id.*) Dr. Vemuri noted, however, high cholesterol and high blood sugar. (*Id.*)

After their August 2009 visit, Hill did not see Dr. Wadenstorer (or Dr. Vemuri) again until March 2010. (Tr. 203, 225.) Dr. Wadenstorer noted that this seven-month treatment gap was due in

part to Hill's three-month trip to Alabama. (Tr. 203.) Hill reported that while he had not taken any prednisone from October 2009 to December 2009, he restarted the medication when he returned to Michigan in January 2010. (*Id.*) Dr. Wadenstorer noted, "[Mr. Hill] states that he is getting better now. He has no cough, wheeze, sputum production or shortness of breath. He feels considerably better. He states that he is taking his Advair as prescribed. He is using his CPAP and states that he is sleeping well." (*Id.*) In terms of treatment, Dr. Wadenstorer kept Hill's medications constant in view of Hill's improved condition since restarting medication. (Tr. 204.) The pulmonologist did order a "high-resolution CT scan" and ACE (angiotensin-converting enzyme) testing, however. (*Id.*) ACE levels can be used to monitor the severity of sarcoidosis.

In March 2010, Dr. Vemuri diagnosed Hill with high cholesterol, increased the dosage of the corresponding medication, noted that Hill's high blood pressure was under "good control," and, based on recent laboratory testing, diagnosed Hill with non-insulin-dependent diabetes. (Tr.224-25.)

Hill next saw Dr. Wadenstorer in April 2010; the physician noted, "Mr. Hill comes in today actually doing quite well." (Tr 201.) Although Hill was still experiencing some shortness of breath at work, he denied a cough, wheezing, or chest tightness or pain. (*Id.*) Dr. Wadenstorer informed Hill that treatment for sarcoidosis could last for up to two years, and that Hill should continue taking prednisone. (Tr. 202.)

In May 2010, Hill sought treatment from Dr. Vemuri because of a recent high blood pressure test. (Tr. 222.) Dr. Vemuri also noted, "[Mr. Hill] states he cannot work anymore because of the increased shortness of breath secondary to sarcoidosis." (Tr. 222.) On exam, Dr. Vemuri noted that Hill's "[a]ir entry" was "good." (*Id.*) He advised Hill to have his blood pressure rechecked in a week. (*Id.*)

In June 2010, Dr. Wadenstorer performed another "[c]omplete pulmonary function test." (Tr. 267.) As with the July 2009 study, his impression was a "[n]ormal physiologic study." (*Id.*) He noted, however, that Hill's forced expiration was "moderately reduced" and that Hill had a "moderate decrease in forced vital capacity." (*Id.*) On the day of the testing, Hill continued to report doing well, having no cough, and not experiencing chest tightness or pain. (Tr. 258.) Despite elevated ACE levels, Dr. Wadenstorer noted that Hill's "sarcoidosis seem[ed] to be improving." (*Id.*)

At his July 2010 appointment with Dr. Vemuri, Hill reported doing well and denied chest pain and shortness of breath. (Tr. 277.)

Hill's next appointment with Dr. Wadenstorer was in September 2010. (Tr. 256-57.) Dr. Wadenstorer noted that a recent high-resolution CT scan showed "increased interstitial alveolar pattern" and "enlarged mediastinal and hilar nodes," but was "overall unchanged" from the March 2010 scan. (Tr. 256.) Hill's ACE level had increased to 99 from 86 in June 2010. (Tr. 256.) Dr. Wadenstorer opined, "I do not feel he is responding appropriately to corticosteroids. He has not, however, been on them continuously for one year. I have told him we will continue his present medical management until January, at which point we will repeat ACE level [testing] and [the] high-resolution CT scan." (Tr. 256-57.)

In December 2010, Hill went to see Dr. Vemuri for "multiple problems." (Tr. 298.) Hill had been experiencing muscle aches, high blood sugar, an inability to sleep, and a separation with his wife. (Tr. 298.) Hill denied, however, chest pain or shortness of breath. (Tr. 298.)

Consistent with Dr. Wadenstorer's plan, Hill underwent another high-resolution CT scan at the end of January 2011. (Tr. 295.) The radiologist opined that there was a "slight interval improvement in nodular densities along bronchovascular bundles involving both lung fields as well

6

as ground-glass opacities" since the March 2010 scan. (Tr. 295.) Hill's "extensive mediastinal and hilar adenopathy" was stable in appearance. (*Id.*)

Sometime in early February 2011, Hill went to the emergency room. (Tr. 296.) At a February 7, 2011 follow-up appointment, Dr. Vemuri explained: "[Mr. Hill] went to the emergency room because of the chest pain. He said prior to that he was shoveling snow." (Tr. 296.) On exam, Hill's heart, lungs, and other systems were "within normal limits." (Tr. 296.)

That same day, February 7, Hill also saw Dr. Wadenstorer. (Tr. 291-92.) Similar to his appointment with Dr. Vemuri, Hill reported no increased cough, wheezing, or chest pain. (Tr. 291.) Hill's oxygen saturation on "room air" was 96%; his chest exam was "clear to auscultation and percussion"; his cardiac exam was "benign." In fact, Dr. Wadenstorer noted that ACE level testing in January 2011 revealed that Hill was now at 40, within the normal range. (*Id.*) It was Dr. Wadenstorer's opinion that Hill was "responding to treatment." (*Id.*)

Two days later, however, Hill returned to the emergency room with chest pain. (Tr. 300.) He reported having chest pain at the three out of ten level while at a grocery store. (*Id.*) After the pain increased to a seven out of ten level, Hill took nitroglycerin. (*Id.*) When that did not help, he went to the emergency room. (*Id.*) Although he had chest pain, Hill did not have radiation, shortness of breath, or diaphoresis. (*Id.*) While in the hospital, Dr. Rivera, the cardiologist Hill had seen in 2009, recommended a heart catheterization "to evaluate [Hill's] coronary anatomy." (Tr. 302.) The catheterization revealed that there was no evidence of occlusive coronary artery disease; Dr. Rivera, however, diagnosed hypertensive heart disease. (Tr. 305.) Hill was to follow up with Dr. Vemuri

in two weeks.[2]

### C. Testimony at the Hearing Before the ALJ

At the June 2011 hearing before ALJ Bunce, Hill described his last work attempt. Hill said that in 2010 he attempted to complete a "small [construction] job" on "some steps." (Tr. 40.) But, said Hill, "I wasn't able to do it. I wasn't able to keep up and the person that was over me, had to let me go." (*Id.*)

In response to the ALJ's question about how long Hill could "sustain . . . activity," Hill responded, "I don't know, so far, about an hour." (Tr. 44.) After an hour, Hill said that he would have "[s]hortness of breath, fatigue, and every now and then . . . chest pains." (*Id.*) As is particularly relevant to Hill's appeal to this Court, this colloquy then ensued:

> [HILL'S COUNSEL] What do you do after that hour? Do you go sit down? Do you go lie down? Do you go recline? What do you do?
> [HILL] I will recline.
> Q Okay. And, when you recline, where are your feet? At, above, or below waist level?
> A Above waist level.
> Q Okay. And, why do you utilize that position?
> A It helps me breathe better.
> Q Okay. Now, how long do you typically stay in that type of position at one time before, then maybe you get up and—
> A Sometimes an hour and sometimes two.
> Q Okay. And, is this something that happens every day? This type of

---

[2]The administrative transcript before the Court contains additional records that the Court has not reviewed and will not summarize here. These records were added to the transcript after the ALJ's decision. But, because the Appeals Council denied Hill's request for review, it is the ALJ's decision that this Court reviews. This Court therefore considers the same materials that the ALJ considered. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n.1 (E.D. Mich. Jan. 19, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) and *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)), *report and recommendation adopted*, 2012 WL 401015 (E.D. Mich. Feb. 8, 2012).

8

> routine, so to speak?
> A And, it helps me to breathe.

(Tr. 44-45.) At another point in his testimony, however, in response to an ALJ's question about how much time Hill spent lying down during the day, Hill responded, "I would say two hours." (Tr. 42.)

When the ALJ asked Hill why he thought he could not perform sedentary work, i.e., full-time jobs that involved sitting "without much lifting," Hill responded, "I couldn't tell you. I never did that." (Tr. 43.) Hill elaborated, however, that he did not perform any household chores for eight-hours per day. (Tr. 43.)

After Hill completed his testimony, the ALJ asked a vocational expert about job availability for a hypothetical individual of Hill's age, education, and work experience who was capable of unskilled, sedentary work performed in an environment that "does not expose the worker to poor ventilation, or extremes of dust, humidity, or temperature" and permitting a worker to elevate his feet up to ten inches. (Tr. 48-49.) The vocational expert responded that there would be unskilled, sedentary jobs available to this person: information clerk, general office clerk, and ticket checker. (Tr. 49.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Bunce, applying this sequential process, found that Hill had not engaged in substantial gainful activity since the alleged disability onset date of June 15, 2009. (Tr. 24.) At step two, he found that Hill had the following severe impairments: "chronic-obstructive pulmonary disease, sarcoidosis, coronary-artery disease." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 25.) Between steps three and four, the ALJ determined that Hill had the residual functional capacity to "perform work that does not require[] exertion above the sedentary level; or exposure to poor ventilation or extremes

of dust, humidity, or temperature; and that allows elevation of feet to no more than eight-to-10 inches above the floor." (*Id.*) At step four, the ALJ found that Hill was unable to perform any past relevant work. (Tr. 27.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Hill's age, education, work experience, and residual functional capacity. (Tr. 27-28.) ALJ Bunce therefore concluded that Hill was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, June 21, 2011. (Tr. 28.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation

marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Hill's appeal consists of a single claim of error. (Dkt. 9, Pl.'s Mot. Summ. J. at 7-12.)[3] He says that the vocational expert's testimony is not substantial evidence supporting the ALJ's step-five finding that there are sedentary jobs available to him. This is so, Hill claims, because he is more functionally limited than the hypothetical individual considered by the vocational expert. In other words, Hill says that the ALJ's hypothetical was flawed. In support of this claim, Hill relies on his own testimony. Hill says that he told the ALJ that he could "perform sustained work for one hour" and then he "must sit down and recline his feet at waist level for two hours." (Pl.'s Mot. Summ. J. at 9.) Hill adds that the vocational expert testified that "once your leg elevation gets to the point

---

[3]Hill, in one paragraph, claims that the ALJ erred in "say[ing] that his disability has not been present since the alleged date of December 31, 2009." (Pl.'s Mot. Summ. J. at 12.) Although presented as a separate argument (*see id.* at 7), it appears that it simply is an extension of Plaintiff's primary claim of error but with a later disability onset date.

where you can no longer sit upright and perform the duties, then it becomes work preclusive." (*Id.* at 11 (citing Tr. 49).) Together, Hill implies, this testimony shows that he is unable to work a full-time job—even a sedentary one.

An essential premise of Hill's argument is that substantial evidence does not support the ALJ's decision to discredit Hill's testimony about needing to recline for one or two hours after an hour of activity. Hill, however, has not established this premise; the administrative record is not so one-sided that the Court should decline to defer to ALJ Bunce's credibility determination. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying."); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle.").[4]

To be sure, some evidence in the record supports Hill's testimony of disabling functional limitations. Chiefly, Dr. Rivera's June 2009 stress test indicating that Hill had "[m]oderate to severe functional limitation for [his] age," Hill's February 7, 2011 emergency room visit for chest pain, and Hill's February 9, 2011 hospitalization for chest pain.

Still, the ALJ could have reasonably discounted the significance of each of these records given his focus on whether Hill could perform sedentary work. The stress test results followed four minutes of exercise; indeed, the same report provides that Hill's "baseline," presumably at-rest, ejection fraction was normal, and that, at baseline, Hill had only "mild pulmonic insufficiency" and

---

[4]ALJs must also comply with certain procedures in analyzing a claimant's credibility. *See Wallace v. Comm'r of Soc. Sec.*, No. 12-11548, 2013 WL 3467214, at *16 (E.D. Mich. July 10, 2013). Hill makes no procedural challenge, however.

"mild pulmonary hypertension." (Tr. 244.) Similarly, on February 7, 2011, Hill experienced chest pain after exertion not commensurate with sedentary work: shoveling snow. (Tr. 296.)

Although the February 9, 2011 incident occurred at a grocery store, and, therefore, presumably while Hill was not exerting himself beyond the demands of sedentary work, the administrative record suggests that this event was not representative of Hill's condition during the disability period. In other words, the ALJ reasonably found that Hill's "treatment remained relatively conservative until his February 2011 heart catheterization," (Tr. 26). In particular, despite having shortness of breath in June 2009, and reporting fatigue at work in August 2009, Hill continued as a brick mason until October 2009. (Tr. 169.) And, given his contemporaneous move to Alabama, it is not even clear that he then stopped work because of his impairments. (Tr. 203.) The fact that Hill worked until October 2009 in a position that the vocational expert classified as "heavy" exertion (Tr. 48), supports a finding that Hill did not then need to recline for two hours after one hour of exertion.

And the portion of the administrative record corresponding to the remainder of the disability period also substantially supports the ALJ's credibility determination. As noted by the ALJ, upon his return from Alabama, Hill restarted his prednisone treatment and, as a result, was "getting better"; indeed, Hill reported no coughing, wheezing, or shortness of breath. (Tr. 26, 203.) In March 2010, Hill reported doing quite well. (Tr. 201.) He said the same in April 2010. (Tr. 201.) In June 2010, a complete pulmonary function test was normal. (Tr. 267.) Hill again reported doing well without a cough or chest pain. (Tr. 258.) Hill's July 2010 report to Dr. Vemuri was similar. (Tr. 277.) In September 2010, Dr. Wadenstorer noted that Hill was "doing fairly well." (Tr. 256.) On February 7, 2011—just two days prior to the grocery-store incident—Hill's oxygen saturation on

14

"room air" was 96%, his ACE level readings were normal, and Dr. Wadenstorer thought that Hill was "responding to treatment." (Tr. 291.)

Given this evidence, much of which the ALJ discussed, the Court believes that substantial evidence supports the ALJ's conclusion: "I can reasonably find that the claimant has limitations associated with COPD [chronic obstructive pulmonary disease], sarcoidosis, and CAD [coronary artery disease], but I cannot reasonably find that they impose limitations which would preclude sedentary exertion." (Tr. 26.) In other words, Hill has not shown that the ALJ's decision not to credit his testimony about needing to lie down two hours per day, or two hours per one-hour of activity, lacks substantial evidentiary support.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, substantial evidence supports the ALJ's decision to discount Hill's credibility, and, therefore, Hill has not demonstrated that the ALJ's hypothetical to the vocational expert was flawed. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 11) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues

but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: October 2, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 2, 2013.

s/Jane Johnson
Deputy Clerk